Andrew D. Bluth (SBN 232387)
Christopher R. Rodriguez (SBN 212274)
Grayson C. Bowman (SBN 367682)
SINGLETON SCHREIBER, LLP
1414 K Street, Suite 300
Sacramento, CA 95814-3966
Telephone: 916-775-5894
Facsimile: 619-255-1515
abluth@singletonschreiber.com
crodriguez@singletonschreiber.com
gbowman@singletonschreiber.com

Maggy Krell (SBN 226675)
3053 Freeport Blvd., #152
Sacramento, CA 95818
maggykrell@gmail.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ASSEMBLYWOMAN MAGGY KRELL, an individual,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARKWAYNE MULLIN, Secretary of the U.S. Department of Homeland Security, in his official capacity; DAVID VENTURELLA, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity; DOES 1 through 20,<br><br>Defendants. | Case No:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ASSEMBLYWOMAN MAGGY KRELL ("Plaintiff"), brings this action against the DEPARTMENT OF HOMELAND SECURITY ("DHS"), IMMIGRATION AND CUSTOMS ENFORCEMENT ("ICE"), DHS Secretary MARKWAYNE MULLIN, in his official capacity ("Mullin"), Acting Director DAVID VENTURELLA, in his official capacity ("Venturella"), and DOES 1-20 (collectively "Defendants") and alleges as follows:

## I. SUMMARY OF THE CASE

1. This action arises under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 et seq., and seeks declaratory and injunctive relief compelling Defendants to comply with their statutory obligations to disclose agency records. Specifically, Plaintiff seeks records reflecting guidance, policies, instructions, communications, correspondence, other related documents, and security footage concerning the unannounced and illegal closure of public buildings and the arrests of people attending mandated hearings at California immigration courts—an enforcement practice that represented a significant shift in operations for ICE and the Executive Office for Immigration Review ("EOIR"), has generated substantial public concern and judicial scrutiny, and revealed the extraordinary March 2026 admission by the Department of Justice ("DOJ") that ICE misled its own prosecutors and the federal courts for nearly a year about the very legal authority undergirding those arrests. The Court in that case later stayed the ICE policies in question at three Manhattan Courthouses.

2. The need for disclosure is especially urgent now because another federal court in the Northern District of California has now **vacated nationwide ICE and EOIR policies authorizing** civil immigration arrests at immigration courthouses. Order, *Pablo Sequen v. Albarran*, No. 5:25-cv-06487-PCP, ECF No. 205 (N.D.Cal. **June 23, 2026**). The court found that courthouse arrests chilled attendance at immigration proceedings and forced noncitizens to choose between appearing as required and risking arrest or avoiding court and jeopardizing their

cases. Because the agencies failed to offer a reasoned explanation for these changes, the court held the policies **arbitrary and capricious under the Administrative Procedure Act**. Yet Defendants continue to withhold the policies, guidance, and communications necessary to understand how those practices were authorized, coordinated, and implemented.

3. The Freedom of Information Act ("FOIA") was enacted to ensure an informed public and to permit meaningful oversight of federal government activity. Defendants' failure to timely process Plaintiff's request, grant expedited processing, disclose non-exempt responsive records, and prematurely and unilaterally close requests without adequate meet and confer has unlawfully deprived Plaintiff, and by extension, the public of information necessary to understand the scope, rationale, and implementation of these immigration court arrest practices. Defendants' refusal to release records deprives Plaintiff and the public of the transparency that the law requires. Hiding information from the public in the context of cruel and sometimes unlawful immigration arrests amounts to a coverup.

4. Plaintiff seeks relief to remedy Defendants' ongoing violations of FOIA and to ensure prompt disclosure of records that will inform active public debate, pending litigation, and judicial consideration concerning arrests conducted in EOIR-controlled facilities and proceedings.

5. After President Trump took office, the EOIR and ICE rescinded policies barring ICE from making civil immigration arrests in or near immigration courts to advance the new administration's agenda of mass deportations. These changes necessarily required internal guidance, inter-agency coordination, and communications involving EOIR personnel, immigration judges, court administrators, and officials within the DOJ.

6. In or around May 20, 2025, ICE began detaining noncitizens appearing for hearings in removal proceedings in immigration courts nationwide

in substantial numbers, including at immigration courts in Sacramento and throughout California.

7. Attorneys from ICE's Office of Principal Legal Advisor ("OPLA") also began orally moving to dismiss these removal and/or asylum proceedings to funnel noncitizens into expedited removal, a process with fewer due process protections and no pathway to permanent residence. Moreover, as part of an underhanded effort to enforce the administration's new policies, Plaintiff is informed and believes that EOIR directed immigration judges to grant ICE's OPLA motions to dismiss immigration proceedings immediately in violation of several agency policies, and to bring these individuals into the immigration courts where ICE was waiting to detain them.

8. Several federal courts across the country have expressed serious concerns regarding arrests conducted in connection with immigration court proceedings and the dismissal of those proceedings, including concerns related to due process and procedural fairness. See, e.g., *Lopez Benitez v. Francis*, 795 F.Supp.3d 475, 499 (S.D.N.Y. Aug. 13, 2025) ("[T]reating attendance in immigration court as a game of detention roulette is not consistent with the constitutional guarantee of due process."); *Mata Velasquez v. Kurzdorfer*, 794 F.Supp.3d 128, 154 (W.D.N.Y. July 16, 2025) (chastising DHS for "pull[ing] the rug out from under [petitioner]"); Maxine Bernstein, Federal Judge in Oregon: Homeland Security 'Tricked' Asylum Seeker Before Arrest at Immigration Court, The Oregonian (July 15, 2025, 10:47 AM), https://tinyurl.com/mw3w9xdj (reporting that a federal judge "blasted" the DHS for its "series of procedural errors," "'oscillating legal positions' and clear violation of [a noncitizen]'s due process rights").

9. A court in the Southern District of New York has also preliminarily stayed the EOIR's direction to immigration judges to grant dismissals regarding removal proceedings conducted in Manhattan and the Bronx pending further

litigation. Op. & Order at 46, *African Cmtys. Together v. Lyons*, 1:25-cv-6366 (S.D.N.Y. Sept. 12, 2025), ECF No. 51. And similar challenges to the lawfulness of arrests and dismissals in other immigration courts are pending elsewhere. See, e.g., Am. Compl., *Pablo Sequen v. Albarran*, No. 25-cv-6487 (N.D.Cal. Sept. 18, 2025), ECF No. 32 (same for the Concord, Sacramento, and San Francisco Immigration Courts).

10. Additionally, the *Pablo Sequen* Court enjoined ICE from making future arrests in northern California area courts, finding that the arrests had a chilling effect on immigrants' access to justice and presented them with an untenable Hobson's choice before later vacating the ICE detention policies nationwide. *Pablo Sequen v. Albarran*, No. 25-cv-6487, ECF Nos. 155 and 205.

11. Beyond the courts, outrage at immigration court arrests, dismissals, and their contested legality has prompted public pushback: protestors demonstrated outside immigration courts in California and around the country against these enforcement tactics and attempted to stop ICE from transporting arrested noncitizens to detention centers; clergy, military veterans, political leaders, and other members of the public accompanied noncitizens to their removal hearings to document, and try to prevent, arrests (and at times faced arrest themselves for doing so); and editorial boards called for Defendants to cease immigration court arrests and dismissals.

12. Sacramento (as well as the rest of California) has been no exception to the national trends. Sacramento residents have been deeply affected as members of their families and communities who were lawfully attending their hearings were arrested without warning. Without knowing the details of the policy change, or the circumstances of the arrests, residents had to worry whether they, or those they care about, were also at risk.

13. Immigration court arrests and dismissals also generated widespread and exceptional media interest. National, state, and local media outlets have

published hundreds of articles about these enforcement tactics since May 20, 2025, many of which express doubt about their integrity and legality. This ongoing public attention underscores the urgency of informing the public about the policies and coordination underlying these practices while they are actively being implemented and litigated.

14. Amidst this widespread media attention and public outrage, Plaintiff Krell, an elected legislator whose constituents are among those directly impacted by the activities of ICE, at EOIR immigration courts, and beyond, filed a FOIA request with ICE on August 11, 2025. The narrowly tailored request followed EOIR's closure of the Sacramento Immigration Court, where family members, journalists and lawyers were prohibited from entering the public building while immigration proceedings were pending. Plaintiff Krell sought records related to directives, memorandums or correspondence that would explain the justification for closing the building to the public. A true and correct copy of this August 11, 2025 FOIA request is attached hereto as **Exhibit A**.

15. On November 26, 2025, ICE sent an email to Plaintiff Krell which noted that the request needed further clarification, claimed the fee waiver was premature, and denied the request for expedited processing. It also contained instructions on how to discuss the needed clarifications.

16. On Tuesday, December 16, 2025, Plaintiff Krell and her legal counsel had a phone conversation with Angela M Mendez Flores, a Supervisory Paralegal Specialist with DHS ICE FOIA Office. Their conversation was memorialized by an email that same day from Ms. Mendez Flores which noted that Plaintiff Krell agreed to clarifications for some requests but did not relinquish her right to the originally worded requests.

17. Assemblymember Krell sought these records and requested expedited processing in order to educate the public about the policies, guidance, and communications surrounding these immigration court arrests.

18. Now, more than a year after submitting the original request, and having heard nothing further from Ms. Mendez Flores or other ICE officials, despite repeated follow-up attempts, and having received no records responsive to her requests, Plaintiff brings this FOIA action for injunctive and other appropriate relief.

19. Plaintiff submitted a valid FOIA request to ICE on August 11, 2025, seeking agency records reasonably described and directly related to ICE's operations, guidance, and coordination concerning arrests conducted in or around immigration courts, coordination between ICE and EOIR regarding the closing of Immigration Courts to the public, and an ICE strategy of apprehending individuals with affirmative asylum applications pending with United States Citizenship and Immigration Services ("USCIS").

20. The requested records are "agency records" within the meaning of FOIA because they were created or pertained to ICE personnel and are maintained under the agencies' possession or control in the course of official business.

21. Defendant was required to make a determination regarding Plaintiff's request within twenty working days, 5 U.S.C. § 552(a)(6)(A)(i), and to determine whether to grant expedited processing within ten calendar days, id. § 552(a)(6)(E)(ii)(I).

22. Defendants failed to comply with these statutory deadlines, failed to grant expedited processing, and failed to produce any responsive, non-exempt records. Defendants also failed to make a timely determination even accounting for any permissible extension under 5 U.S.C. § 552(a)(6)(B).

23. Defendant has therefore constructively exhausted Plaintiff's administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C).

24. Defendant has failed to conduct a search reasonably calculated to locate all records responsive to Plaintiff's request.

25. To the extent Defendant has withheld records or portions of records,

they have failed to justify withholdings with the specificity required by FOIA.

26. Defendant has also failed to release reasonably segregable, non-exempt portions of responsive records, as required by 5 U.S.C. § 552(b).

27. Defendant's ongoing failure to comply with FOIA has irreparably harmed Plaintiff and the public by preventing timely access to information concerning actual federal government activity that is the subject of widespread public debate and active judicial review.

## II. PARTIES

28. Plaintiff MAGGY KRELL is a California State Assemblywoman for District 6 which includes large portions of Sacramento and the surrounding area. Her district includes the John Moss Federal Building where immigration arrests occurred. Plaintiff Krell has a vested interest in knowing what happened to her constituents and their family members as well as understanding the impact of federal policies throughout California to inform her state policymaking. This is especially true with regard to the arrests which took place at immigration courts within California, and specifically within District 6, where her constituents were and are presenting themselves for federal immigration hearings.

29. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level department of the United States and an "agency" within the meaning of 5 U.S.C. § 552(f)(1), 5 U.S.C. § 552(f), and 5 U.S.C. § 702. One of the primary missions of DHS is to "ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. § 111(b)(1)(A), (B), (F). DHS is the parent agency of ICE and maintains ultimate oversight of the components tasked with the administration and enforcement of the nation's immigration laws. DHS has possession, custody, or control of records responsive to Plaintiff's FOIA requests.

30. Defendant U.S. Immigration and Customs Enforcement ("ICE") is a subcomponent of DHS and an "agency" within the meaning of 5 U.S.C. §

552(f)(1), 5 U.S.C. § 552(f), and 5 U.S.C. § 702. ICE was established within DHS to perform functions including "[t]he Border Patrol program," "[t]he detention and removal program," "[t]he intelligence program," and "[t]he investigations program." 6 U.S.C. §§ 251(1)-(4), 252(a)(3). The agency's legal advisor is tasked to "represent the agency in all exclusion, deportation, and removal proceedings before the Executive Office for Immigration Review." 6 U.S.C. § 252(c). ICE has possession, custody, or control of records responsive to Plaintiff's FOIA requests.

## III. JURISDICTION AND VENUE

31. This Court has subject matter jurisdiction over this action pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1331.

32. This Court has authority to grant declaratory and injunctive relief pursuant to 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. §§ 2201-2202.

33. Venue is proper in this Court pursuant to 5 U.S.C. § 552(a)(4)(B) because Plaintiff Krell represents this district, and/or because agency records responsive to Plaintiff's request are situated in this district.

34. Defendants are an agency of the United States and are subject to suit in this Court under FOIA.

## IV. FACTUAL BACKGROUND

### A. ICE ARRESTS & DISMISSALS AT IMMIGRATION COURTS

#### i. ICE Arrests in Sacramento and Other Parts of California

35. Starting in May 2025, ICE changed a long-standing policy and began enforcing civil immigration enforcement arrests in and around immigration courts. EOIR judges, at the direction of their superiors, acted in concert with ICE agents to dismiss cases which then allowed ICE to immediately detain individuals and put them into expedited removal.

36. Upon information and belief, at least six detentions occurred at the

Sacramento Immigration Court as of June 11, 2025.[1] According to records obtained by the Sacramento Bee, 39 people were detained after attending routine immigration hearings from May 27 through late September.[2] Then in December, at least a dozen Afghan refugees were arrested during their check-ins.[3] Around 130 total arrests were made in the San Francisco and Concord Immigration Courts by December 26, 2025.[4] During July 2025, it was not uncommon for there to be daily arrests in Sacramento.[5] In some instances, the arresting officers have utilized physical force and caused individuals not being detained to be injured.[6]

37. These enforcement techniques were unprecedented. In sworn declarations, several witnesses noted that for decades prior to May 2025, ICE only arrested individuals at Immigration Courts in limited circumstances.[7]

38. These extreme measures have led to fear and confusion in local communities.[8] Large numbers of individuals are no longer attending their immigration hearings because they are worried they will be detained if they do.[9]

**ii. Courthouse Arrest Policies & Practices Before the Second Trump Administration**

39. For decades, ICE officers largely refrained from civil immigration enforcement actions—including civil immigration arrests—in immigration courts, lest such arrests deter noncitizens from attending removal proceedings, impede the proper functioning of courts, and undermine the fair administration of justice.

40. ICE formalized this longstanding practice in an April 2021 memo that prohibited "civil immigration enforcement action … in or near a courthouse" (including immigration courts) absent a national security threat; imminent risk of

---

[1] https://www.youtube.com/watch?v=CAMIMaqf3T4
[2] https://www.sacbee.com/news/local/article314296524.html#storylink=cpy
[3] https://www.sacbee.com/news/local/article313404644.html
[4] https://www.ktvu.com/news/judge-orders-halt-ice-arrests-san-francisco-courthouse
[5] https://www.capradio.org/articles/2025/07/11/ice-arrests-asylum-seeker-after-sacramento-court-hearing/
[6] https://www.sacbee.com/news/local/article312274458.html
[7] *Pablo Sequen v. Albarran*, No. 25-CV-06487-PCP, 2025 WL 3724878, at *2 (N.D.Cal. Dec. 24, 2025)
[8] https://www.capradio.org/articles/2025/07/11/ice-arrests-asylum-seeker-after-sacramento-court-hearing/
[9] https://www.sacbee.com/news/local/article312274458.html

death, violence, physical harm to any person, or destruction of evidence material to a criminal case; or hot pursuit of an individual posing a threat to public safety. U.S. Dep't of Homeland Sec., Memorandum re: Civil Immigration Enforcement Actions in or near Courthouses (Apr. 27, 2021), https://tinyurl.com/yw6ucd49.

41. Approximately two and half years later, the EOIR prohibited the DHS from making civil immigration arrests and taking other civil immigration enforcement actions "in or near an immigration court" except in the limited circumstances described above or where "a safe alternative location for the enforcement action d[id] not exist." U.S. Dep't of Just., Exec. Off. for Immigr. Review, Off. of the Chief. Immigr. Judge, PM 23-01, Operating Policies & Procedures Memorandum 23-01: Enforcement Actions in or Near OCIJ Space (Dec. 11, 2023), https://tinyurl.com/ycyr2hsy.

**iii. Trump Administration's Mass Deportations**

42. The Trump administration initiated a "light speed" mass deportation campaign designed to significantly increase ICE's enforcement power. To drive immediate results, officials established initial daily quotas of more than 1,000 arrests and threatened to hold agency leadership accountable for any shortfalls.

43. When ICE struggled to reach these targets through the early months of 2025, the administration responded by removing the acting director and several other top immigration officials. By May, frustration over the pace of enforcement led the administration to "supercharge" the effort, doubling the daily arrest goal to 3,000 individuals. This escalation included further leadership changes within the Enforcement and Removal Operations Directorate to ensure strict adherence to the administration's expanded deportation agenda.

**iv. Immigration Court Arrests, Dismissals, & Policy Changes**

44. Meanwhile, the Administration authorized ICE to conduct civil immigration arrests in and around immigration courts to help it meet its daily quota.

45. On January 21, 2025, ICE rescinded the April 2021 memo. On an interim basis, it also authorized agency officers or agents to "conduct civil immigration actions in or near courthouses when they have credible information that leads them to believe the targeted [noncitizen(s)] is or will be present at a specific location, and where such action is not precluded by the jurisdiction in which the enforcement action will take place." U.S. Immigr. & Customs Enf't, Policy No. 11072.3, Interim Guidance: Civil Immigration Enforcement Actions in or near Courthouses (Jan. 21, 2025).

46. Seven days later, the EOIR "rescinded and cancelled" its prohibition of "civil immigration actions by the Department of Homeland Security (DHS) in or near EOIR space." U.S. Dep't of Just., PM 25-06, Cancellation of Operating Policies & Procedures memorandum 23-01 (Jan. 28, 2025).

47. Around May 20, 2025, as the number of arrests and deportations remained below target, ICE began to arrest noncitizens in immigration courts – where they are easy to locate – and seek their removal through expedited removal[10] – a faster process with fewer due process protections and no pathway to permanent residence.

48. ICE also instructed OPLA prosecutors to identify any noncitizen with upcoming immigration court hearings who would be susceptible to expedited removal if their immigration court case were dismissed and move to dismiss these cases. It further directed OPLA prosecutors to tell ERO officers about such a noncitizen at least 48 hours in advance of the upcoming hearing and provide "the exact location of the courtroom at which the . . . hearing is being held and an estimate of the time frame for the hearing." It also ordered OPLA prosecutors to give the immigration court "a 24-hour warning" of the planned enforcement

[10] Expedited removal allows immigration officers to remove a noncitizen who has "not been admitted or paroled in the United States" and "not affirmatively shown, to the satisfaction of an immigration officer" continuous physical presence for at least two years, from the United States "without further hearing or review" unless the noncitizens "indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A).

operation.[11] These directives necessarily required coordination with EOIR personnel and advance notice to immigration courts, generating records maintained by EOIR.

49. On May 27, 2025, ICE published its final guidance for courthouse arrests, wherein it authorized agency officers and agents to "conduct civil immigration enforcement actions in or near courthouses when they have credible information that leads them to believe the targeted [noncitizen(s)] is or will be present at a specific location," even in jurisdictions whose laws preclude courthouse arrests. U.S. Immigr. & Customs Enf't, Policy, No. 11072.4, Civil Immigration Enforcement Actions in or near Courthouses (May 27, 2025).

50. Around the same time, the EOIR emailed Assistant Chief Immigration Judges (ACIJs)[12] new guidance for ICE motions to dismiss and courthouse arrests. Notwithstanding agency regulations and policy requiring parties to make pre-trial motions "in writing and . . . state, with particularly the grounds therefor," 8 C.F.R. § 1003.23(a), the guidance allows "DHS Motions to Dismiss [to] be made orally and decided from the bench" without "additional documentation or briefing." Am. Immigr. Lawyers Ass'n, AILA Doc. 25061204, Practice Alert: EOIR Guidance to Immigration Judges on Dismissals and Other Adjudications (June 12, 2025), https://tinyurl.com/mr22255e (hereinafter, "AILA Doc. 25061204").

51. The guidance also advises that "[t]he motion to dismiss is regulatory" based upon Immigration and Nationality Act (INA) § 239.2(a)(6) (Notice to Appear "improvidently issued") or INA § 239.2(a)(7) ("[C]ircumstances have changed to such an extent that continuation is no longer in the best interest of the government"), *id*, misstating the standard for dismissal for changed circumstances. *cf*. 8 C.F.R. § 239.2(a)(7), (c) ("Circumstances *of the case* have changed after the

---

[11] Hamed Aleaziz et al., How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests, N.Y. Times (May 30, 2025), https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html

[12] ACIJs "oversee the operations of specific immigration courts and adjudication centers." U.S. Dep't of Just., Exec. Off. for Immigr. Rev., Immigration Court Practice Manual § 1.3(a)(4) (2023).

notice to appear was issued to such an extent that continuation is no longer in the best interest of the government." (emphasis added)).

52. The guidance further provides that "[g]enerally, if DHS has met the regulatory burden, the oral motion to dismiss may be granted" without "[a] 10-day response period," AILA Doc. 25061204, despite agency policy giving noncitizens ten days to respond to such motions, U.S. Dep't of Just., Exec. Off. for Immigr. Rev., Immigration Court Practice Manual 3.1(b)(1)(A) (2023).

53. Finally, the guidance directs ACIJs to ensure the immigration judges and administrative staff under their supervision "are familiar with Policy Memo 25-06"—which rescinded past guidance barring ICE arrests at immigration courts—and to reach out to the Regional Deputy Chief Immigration Judge supervising them if they "encounter any unusual circumstances with an enforcement action." AILA Doc. 25061204.

54. Pursuant to this guidance, ACIJs have directed and pressured immigration judges they supervise to grant ICE motions to dismiss unless they are defective.

55. ICE has arrested thousands of noncitizens in immigration courts around the country since May.

56. ICE also filed 6,221 motions to dismiss noncitizens' removal proceedings between May 20, 2025, and July 28, 2025, almost 81 percent of which were oral.

57. Immigration judges adjudicated 86 percent of these motions on the day they were filed, granted 86 percent of those motions, and dismissed 4,558 noncitizens' removal proceedings, allowing ICE to put them into expedited removal. These figures underscore the scale and systemic nature of the policy shift, and the resulting public interest in disclosure of the guidance and communications governing these practices.

**v. Public Pushback Against Immigration Court Arrests and Dismissals and Court Findings of Illegality**

58. Immigration court arrests and dismissals have outraged the American public and prompted massive pushback.

59. Protestors have demonstrated against these arrests and dismissals outside immigration courts across the country, including in Sacramento, San Francisco, Los Angeles, and San Diego, and attempted to prevent ICE from transferring arrested noncitizens to detention centers.

60. Clergy, military veterans, political leaders, and other members of the public accompanied noncitizens to immigration courts to document, and try to stop, courthouse arrests; comfort the families that ICE was separating; and inform immigration attorneys of arrests so they can file habeas petitions before ICE transfers arrested noncitizens out of the jurisdiction.

61. U.S. Senators and other members of Congress have written to Defendants to express "grave concern over the disturbing pattern of [agency] operations taking place at immigration court across the country— including recent incidents … where masked, plainclothes ICE officers detained non-violent, non-criminal immigrants immediately following the dismissal of their existing deportation cases by DHS attorneys."[13]

62. Numerous editorials have decried immigration court arrests and

---

[13] See, e.g., Letter from Members of Congress to Kristi Noem, Sec'y, Dep't of Homeland Sec., and Todd Lyons, Acting Dir., U.S. Immigr. & Customs Enf't (June 5, 2025), https://www.aila.org/86-representatives-urge-dhs-to-end-arrests-at-immigration-courts; Letter from U.S. Senators to Kristi Noem, Sec'y, U.S. Dep't of Homeland Sec., Todd Lyons, Acting Dir., U.S. Immigr. & Customs Enf't, and Pam Bondi, Att'y Gen., U.S. Dep't of Just. (July 11, 2025), https://tinyurl.com/52yrx4p3.

dismissals as "a set-up,"[14] "a farce,"[15] "shameful,"[16] and "seriously disturbing."[17]

63. Earlier this year, the Chief Judge of the Eastern District noted publicly that the sheer number of immigration detentions was flooding the Eastern District, causing strain on the Court system.[18]

64. Lawyers have challenged dozens of immigration court arrests in habeas petitions.

65. Courts considering these petitions have ordered relief in cases challenging detention following immigration-court arrests, and some have found that the arrests are likely unlawful and ordered ICE to release the arrested noncitizens. See, e.g., *Lopez-Arevalo v. Ripa*, 801 F.Supp.3d 668 (W.D. Tex. Sept. 21, 2025); *Pablo Sequen v. Kaiser*, No. 25-cv-06487, 2025 WL 2691143, at *1-4 (N.D. Cal. Sept. 19, 2025); *Lopez Benitez*, 795 F.Supp.3d 475, 494 ("counsel for Respondents could neither confirm nor deny the existence of the alleged policy, or its application to [Petitioner].. . ..The utter lack of transparency here is problematic, to say the least, as it makes it impossible to determine why Mr. Lopez Benitez was detained in the first place."); *Velesquez v. Kurzdorfer*, 794 F.Supp.3d 128, (W.D.N.Y. July 16, 2025).

66. Advocates also sued ICE to stop it from arresting noncitizens at immigration courthouses and the EOIR to prevent it from dismissing noncitizens' removal proceedings without proper process. See, e.g., Compl., *African Cmtys.*

---

[14] Masked ICE Arrests Raise Urgent Questions About U.S. Immigration Practices, The Riverdale Press (June 26, 2025), https://www.riverdalepress.com/stories/masked-ice-arrests-raise-urgent-questions-about-us-immigration-practices,187060.

[15] Brian Strassburger, S.J. & William Critchley-Menor, S.J., What We Saw During An ICE Arrest & Immigration Court Hearing: The Breakdown of Justice in America, America: The Jesuit Review (July 11, 2025), https://www.americamagazine.org/politics-society/2025/07/11/ice-immigration-court-deportation-injustice-251119.

[16] *Id*.

[17] Veronica Cardenas, I Was Once an ICE Prosecutor. What I See Now in Immigration Courts Is Disturbing, The Hill (July 17, 2025, 8:00AM), https://thehill.com/opinion/immigration/5404863-i-was-once-an-ice-prosecutor-what-i-see-now-in-immigration-courts-is-disturbing/

[18] Hilda Gutierrez et al., Federal Judge Warns ICE Detention Challenges Are Overwhelming His Court, NBC Bay Area (Apr. 8, 2026), https://www.nbcbayarea.com/news/local/ice-detention-federal-judge-court/4064152/.

*Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 1, 2025), ECF No. 1; Compl., *Pablo Sequen v. Albarran*, No. 25-cv-6487 (N.D.Cal. Sept. 18, 2025), ECF No. 32.

67. Recently the court in *Pablo Sequen v. Albarran* granted partial summary judgment and **vacated** nationwide ICE and EOIR policies that eliminated prior restrictions on civil immigration arrests at immigration courthouses, as well as an ICE waiver extending short-term hold room detentions. *Pablo Sequen v. Albarran*, No. 5:25-cv-06487-PCP, Order at 1–38 (N.D.Cal. June 23, 2026), ECF No. 205. The court ruled that the policies were arbitrary and capricious under the Administrative Procedure Act (APA) because the agencies failed to provide reasoned explanations for their departures from prior practice. Specifically, the court highlighted that courthouse arrests chilled attendance at immigration proceedings and forced noncitizens to choose between appearing as required and risking arrest or avoiding court and jeopardizing their cases. The court also granted final class certification for affected noncitizens. The decision confirms that these administrative practices remain subject to active judicial review and reinforces the urgent public interest in disclosure of the policies, guidance, and interagency communications governing immigration enforcement.

68. On July 10, 2026, the court denied Defendants' motion to stay the June 23, 2026 vacatur pending appeal. *Pablo Sequen v. Albarran*, No. 5:25-cv-06487-PCP, Order Denying Motion for Stay Pending Appeal (N.D.Cal. July 10, 2026), ECF No. 217. The ruling left in place the vacatur of ICE and EOIR Policies while appellate proceedings continued. This additional ruling confirms that the challenged policies remained subject to immediate judicial restraint and reinforces the public interest in records explaining their adoption and implementation.

69. The City and State of New York filed amicus briefs in support of enjoining these actions in *African Communities Together v. Lyons*, 25-cv-6366 (S.D.N.Y.), due to their concern that immigration court arrests and dismissals are damaging trust in the justice system as a whole and chilling participation in their

state and local court proceedings. See Order, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 26, 2025), ECF No. 47; Letter Mot. at 10-11, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 25, 2025), ECF No. 44; Brief for Amicus Curiae City of New York in Supp. of Pls.' Mot. for a Stay at 9-10, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Aug. 18, 2025), ECF No. 32-1.

70. On September 12, 2025, the U.S. District Court for the Southern District of New York preliminarily stayed the EOIR's dismissal guidance as to removal proceedings conducted in Manhattan and the Bronx pending a full review of its merits. Op. & Order at. 46, *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. Sept. 12, 2025), ECF No. 51.

71. These rulings reflect the heightened public and judicial scrutiny surrounding these practices and further underscore the urgency of public access to Defendants' policies and guidance.

72. On March 24, 2026 the DOJ filed a letter with the Court where they admitted that the ICE memo which they had used to support the assertion that ICE arrests near courthouses in fact "does not and has never applied to civil immigration enforcement actions in or near Executive Office for Immigration Review ("EOIR") immigration courts." *African Cmtys. Together v. Lyons*, 25-cv-6366 (S.D.N.Y. March 24, 2026), ECF No. 77. On May 18, 2026 the Court stayed ICE's interim guidance issued on January 21, 2025 and May 27, 2025 as applied to three courthouses in Manhattan. *Id*. ECF No. 90.

**vi. Extensive Media Coverage & Lack of Transparency**

73. Immigration court arrests and dismissals and public opposition to this new enforcement tactic were the subject of widespread and exceptional media coverage.

74. Since May 20, 2025, national, state, and local media outlets published hundreds of articles about arrests and dismissals, many of which expressed doubts

about this new enforcement tactic's legality.

75. Media coverage discussed Defendants changing policies and guidance to facilitate this enforcement tactic.[19]

76. Media coverage also suggested that immigration judges and OPLA prosecutors no longer retain the discretion to dismiss cases on a case-by-case basis.[20]

77. Media coverage also alluded to the EOIR collaborating and coordinating with ICE to further immigration court arrests and dismissals.[21]

78. Media coverage also referenced OPLA collaborating and coordinating with ERO to facilitate immigration court arrests.[22]

79. Defendants have not disclosed their new policies and guidance for immigration court arrests and dismissals, notwithstanding a statutory duty to do so. See 5 U.S.C. 552(a)(2)(B) (obligating Defendants to make their "statements of policy" available for public inspection).

80. Nor have Defendants clarified the extent to which OPLA prosecutors retain discretion to consider dismissal on case-by-case basis or the extent to which

---

[19] See, e.g., Aleaziz et al, supra n.8.

[20] See, e.g., Jose Pagliery, Ex-Immigration Judge Reveals Tactics Used to Arrest Migrants Who Show Up for Court, NOTUS (Aug. 14, 2025, 5:18 AM), https://www.notus.org/courts/former-immigration-judge-court-hearings-ice-arrest; Aleaziz et al, supra n.8.

[21] See, e.g., Pagliery, supra n.10; Natalie Yahr, Wisconsin Asylum Seeker Miguel Robles Detained in Unprecedented Wave of Courthouse Arrests, Racine County Eye (June 30, 2025), https://racinecountyeye.com/2025/06/30/miguel-robles-immigration-asylum/; Audrey Conklin & Bill Melugin, Trump's ICE Launches Bold Courthouse Migrant Arrest Strategy to Fast-Track Deportations Biden Avoided, Fox News (June 9, 2025, 4:00 AM), https://www.foxnews.com/us/trumps-ice-launches-bold-courthouse-migrant-arrest-strategy-fast-track-deportations-biden-avoided; Angélica Franganillo Díaz & Priscilla Alvarez, ICE Targets Migrants for Arrest at Courthouses as Trump Administration Intensifies Deportation Push, CNN (June 2, 2025 5:00 AM), https://www.cnn.com/2025/06/02/politics/ice-arrests-migrants-courthouse; Aleaziz et al, supra n.8

[22] See, e.g., Luis Ferré-Sadurní, Immigrants File Class-Action Lawsuit to Stop ICE Courthouse Arrests, NY Times (July 16, 2025), https://www.nytimes.com/2025/07/16/nyregion/trump-ice-arrests-lawsuit-immigrants.html; Nisa Khan, When ICE Is Waiting at Immigration Court What Can Advocates Do?, KQED (July 7, 2025), https://www.kqed.org/news/12047018/how-legal-experts-advocates-are-responding-to-the-detention-of-asylum-seekers; Hamed Aleaziz, Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests, NY Times (June 11, 2025), https://www.nytimes.com/2025/06/11/us/politics/ice-la-protest-arrests.html; Melissa Gomez & Rachel Uranga, Father Ripped From Family As Agents Target Immigration Courts, Arresting People After Cases Dismissed, Los Angeles Times (May 24, 2025, 3:00 AM), https://www.latimes.com/california/story/2025-05-24/ice-agents-swarm-immigration-courts-arresting-people-after-cases-dismissed.

the EOIR, ICE, OPLA, and ERO are coordinating arrests of noncitizens in immigration courts. The withheld guidance constitutes 'statements of policy' and 'interpretations' of general applicability that FOIA requires agencies to affirmatively disclose, independent of any request.

**B. ICE FOIA Requests**

81. Amidst the significant, public controversy over immigration court arrests and dismissals, including those in the local communities represented by Plaintiff, Plaintiff filed FOIA requests with ICE on August 11, 2025, requesting documents related to its guidance for immigration court arrests, communications with EOIR and other agencies about immigration court arrests and dismissals, as well as records pertaining to ICE's decision to arrest individuals with affirmative Asylum applications before USCIS (hereinafter "ICE Requests")[23].

82. Plaintiff sought expedited processing of each ICE Request so she could educate the public about agency guidance for arrests and any coordination between EOIR and ICE before debate about the legality of these arrests and dismissals ends and courts address the matter. There is an urgent public interest in timely disclosure of these records because policies addressing rigid and novel immigration enforcement continue to be pushed; the enforcement actions directly affect noncitizens in immigration courts in Sacramento, the rest of California, and throughout the country; and courts are actively adjudicating challenges to these practices.

83. Ms. Krell's role as a California Assemblywoman puts her in a position of representing her local constituents as well as engaging in policy debates and conversations for the entire state of California and its residents. She needs to know what is happening so she can be informed, and so she can inform the public.

[23] Plaintiff Krell submitted a companion FOIA request to EOIR. As part of the meet and confer process with EOIR, that agency indicated specific documents would reside with ICE, not with EOIR.

84. Among the organizations directly impacted by the activity at the immigration courts is Acacia Center for Justice, a non-profit, non-governmental organization that supports and partners with a national network of human rights defenders who provide free-of-charge legal assistance and defense to immigrants at risk of detention or deportation. ACJ promotes access to legal counsel for all immigrants at risk of detention or deportation. ACJ is deeply invested in ensuring that immigrants and their families are able to safely and securely pursue their legal cases, while promoting access to *pro bono* and nonprofit counsel for people who would otherwise be forced to navigate immigration court proceedings without legal support. One strategy ACJ employs to promote volunteer attorney engagement and access to justice for *pro se* individuals in legal proceedings is to observe Master Calendar Hearings and document practices that will better prepare volunteer attorneys to take on immigration representation.

85. An ACJ advocate was among those locked out of the courthouse on June 13, 2025, and the individuals ACJ advocates for are among those who have hearings in the affected courthouses. Critically, court access was denied to an ACJ attorney advocate despite ACJ staff calling the preceding day to notify the court of the visit and confirm the docket schedule with the court clerk. No court closure or public access restrictions were flagged during this call. Plaintiff Krell's FOIA requests sought information directly related to this activity.

86. Likewise, advocates from the California Immigration Project were directly impacted by EOIR's court closures. California Immigration Project ("CIP") is a 501(c)(3) nonprofit legal services organization providing pro bono community outreach and education, public policy advocacy, and legal assistance and representation for immigrant communities in California. CIP's mission is to empower immigrant communities by providing free, high-quality legal services, education, and community advocacy across California. CIP engages in extensive community education throughout Sacramento and the state to equip underserved

communities with information about their rights and recent developments in immigration law and policy.

87. CIP's advocates were among those locked out of the affected courthouses. The individuals that CIP represents are among those who have hearings in the affected courthouses. Plaintiff Krell's FOIA requests sought information directly related to this activity, especially after redacted documents showing a CIP attorney's attempt to access the shuttered Sacramento building were produced by EOIR following Krell's June FOIA request.

88. Plaintiff submitted narrowly tailored requests addressing discrete subject areas. Many items were limited to ICE policies in California or to the Sacramento, San Francisco, or San Diego Immigration Courts. Other items identified specific ICE or DHS personnel and specified date ranges to be searched.

89. To date, not a single document has been produced.

90. Plaintiff received a generic email from the ICE FOIA Office on November 26, 2025, more than three months after the initial request was sent, which stated that Plaintiff's requests needed to be narrowed, that the fee waiver request was premature, and that the request for expedited processing was denied.

91. The November 2025 communication also gave instructions on how to communicate with the FOIA Office to narrow the request.

92. On December 2, 2025, Plaintiff reached out to the ICE FOIA office to initiate discussions. On December 8, 2025, Plaintiff sent a follow up email because no response had been received from ICE.

93. On December 12, 2025, Ms. Angela M Mendez Flores responded on behalf of DHS ICE FOIA Office offering a few times to coordinate a call. Plaintiff responded the same day scheduling a call for early the next week.

94. The call took place on December 16, 2025. Ms. Mendez Flores sent an email that same day to memorialize the conversation. It noted that items 2, 3, and 4 had been revised in order to narrow the scope.

95. The specific language, senders, recipients, and their positions were included in the language.

96. Item 2 originally sought:

a. "All communications and directives to, from, or within DHS from June 1, 2025, to present regarding the policy for the apprehension of individuals with pending affirmative asylum applications with USCIS."

97. Item 2 was altered to seek the following from the following senders/recipients/positions:

a. "Communications and directives to, from, or within DHS from June 1, 2025, to present regarding any decisions to apprehend individuals in connection with any enforcement activity or operation in any of the California Immigration Courts (Los Angeles Immigration Court, San Francisco Immigration Court, San Diego Immigration Court, Adelanto Immigration Court and Van Nuys immigration Court)."

b. Field Office Director (FOD); Deputy Field Office Director (DFOD); Assistant Field Office Directors (AFODs); and other comparable leadership positions within the California ICE ERO field offices.

98. Item 3 originally sought:

a. "All communications and directives to, from, or within DHS from June 1, 2025, to present regarding any specific apprehension of any individual with pending affirmative asylum applications with USCIS."

99. Item 3 was altered to seek the following from the following senders/recipients/positions:

a. "Communications and directives to, from, or within DHS from

June 1, 2025, to present pertaining to the actual apprehension of individuals in connection with any enforcement activity or operation in any of the California Immigration Courts (Los Angeles Immigration Court, San Francisco Immigration Court, San Diego Immigration Court, Adelanto Immigration Court and Van Nuys immigration Court)."

b. Field Office Director (FOD); Deputy Field Office Director (DFOD); Assistant Field Office Directors (AFODs); and other comparable leadership positions within the California ICE ERO field offices.

100. Item 4 sought:

a. "Any communication between the Office of Chief Counsel at ICE and any Assistant Chief Immigration Judge regarding any closure to the public of any Immigration Court."

101. Item 4 was altered only in the following way:

a. **Parties**: Communications between ICE Office of Chief Counsel and any Assistant Chief Immigration Judge.

b. **Courts / Geographic Scope**: All Immigration Courts located in California.

c. **Timeframe**: From February 1, 2025 to present.

d. **Subject**: Any closure to the public of those Immigration Courts, for any reason (e.g., security, facility, operational, public health, or other causes).

102. The next communication between the parties was Plaintiff's counsel reaching out to Ms. Mendez Flores on January 7, 2026 in order to reschedule a follow-up call which was supposed to be on January 9, 2026.

103. Ms. Mendez Flores responded on January 8, 2026 providing some alternate dates and times. The call took place on January 14, 2026. Production from

Field Offices as well as other sources of documents and rolling production of documents were all discussed.

104. Plaintiff's counsel again reached out to Ms. Mendez Flores on February 2, 2026 to follow up on the call and ask for an update on whether any field offices had responded.

105. Ms. Mendez Flores responded on February 4, 2026 stating that one office had responded with documents and that those documents were being processed and should be released to plaintiff by the following week. She indicated that the other offices had not yet responded, but that she had sent them a follow-up email. This is the last time that any communication was received from ICE. No documents were ever produced.

106. On March 2, 2026, Plaintiff's counsel again emailed Ms. Mendez Flores to follow up on the request – noting that no documents had yet been received – but ICE never responded and has not reached out, nor produced any documents to plaintiff to date.

107. On April 3, 2026, Plaintiff's counsel again emailed Ms. Flores asking for a status update. No response was received.

108. As a result of DHS and ICE's failure to comply with their statutory duties, and following a detailed record of meet and confer to narrow some of the requests, Plaintiff prepared the instant complaint.

109. Thus, despite repeated efforts to narrow and clarify her requests, Plaintiff has received no records, and no substantive response within FOIA's statutory deadlines. Defendant has made it clear that its strategy is to delay, deny, and ignore.

## V. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### VIOLATION OF THE FREEDOM OF INFORMATION ACT (5 U.S.C.§ 552)

110. Plaintiff incorporates the above paragraphs as if fully set forth herein.

111. Defendants' first violation of the Freedom of Information Act is their failure to conduct a reasonable search.

112. Plaintiff has a legal right under FOIA for Defendants to "make reasonable efforts to search for the records" responsive to the ICE Requests. 5 U.S.C. § 552(a)(3)(C).

113. Despite repeated efforts by Plaintiff to clarify and narrow her requests, and despite specifying particular documents, dates, and personnel, Defendant ICE has not conducted reasonable searches for the requested records.

114. Only one field office of many has even sent any documents to be processed.

115. Defendants have also provided no rolling production, and failed to respond to Plaintiff's follow-up inquiry, further demonstrating the unreasonableness of their search efforts.

116. The failures have prevented Plaintiff and the public from timely access to records of substantial public interest and violated FOIA's statutory requirement that agencies conduct reasonable searches for records in their possession, custody, or control. See 5 U.S.C. § 552(a)(3).

117. Defendants have also violated the Freedom of Information Act by their failure to make responsive records promptly available.

118. Plaintiff has a legal right under FOIA to obtain prompt production of all reasonably segregable non-exempt portions of all records sought in the ICE Requests. Id. § 552(a)(3)(A).

119. Despite repeated efforts to clarify and narrow the requests, and despite

specifying particular documents, dates, and personnel, Defendants have yet to make any responsive records available to Plaintiff.

120. Defendants have also failed to release even partial or rolling productions of non-exempt material, and have not provided any justification for withholding records, further violating FOIA's prompt-production requirement.

121. These ongoing failures prevent Plaintiff and the public from timely access to records of substantial public interest, impede informed participation in ongoing public debate, contravene FOIA's statutory purpose of ensuring transparency in federal agency activity, and prevent Plaintiff from providing crucial information to the individuals they represent and their communities.

122. By failing to make records available promptly, Defendants have violated FOIA and its implementing regulations.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A. Assume jurisdiction over the matter;

B. Expedite consideration of this case pursuant to 28 U.S.C. § 1657(a);

C. Order Defendants to grant Plaintiff's expedited processing of the ICE Requests and review any prior denials of such expedited processing;

D. Order Defendants to process the ICE Requests immediately and without further delay;

E. Order Defendants to conduct reasonable searches for all records responsive to the ICE Requests in accordance with 5 U.S.C. § 552(a)(3);

F. Order Defendants to disclose promptly responsive non-exempt records in their entirety and all reasonably segregable, non-exempt parts of other responsive records;

G. Review any and all of Defendants' decisions to redact or withhold information in responsive records as exempt from disclosure;

H. Award Plaintiff costs and reasonable attorneys' fees in this action as provided by 5 U.S.C. § 552(a)(4)(E);

I. Declare that Defendants' failure to comply with FOIA, its implementing regulations, and their statutory obligations, violated Plaintiff's rights; and

J. Grant such other and further relief as the Court may deem just and proper.

## VII. JURY DEMAND

Plaintiff demands trial by jury of all issues so triable as of right.

DATED: September 22, 2026

**SINGLETON SCHREIBER, LLP**

*/s/ Andrew D. Bluth*

Andrew Bluth (SBN 232387)
1414 K St Ste 300
Sacramento, CA 95814-3966
Telephone: 916-775-5894
abluth@singletonschreiber.com

Maggy Krell (SBN 226675)
3053 Freeport Blvd. #152
Sacramento, CA 95818
maggykrell@gmail.com

*Attorneys for Plaintiff*